[Cite as *In re N.J.*, 2012-Ohio-5429.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

IN RE: N.J.

C.A. No.     12CA010221


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     10JC31529

DECISION AND JOURNAL ENTRY

Dated: November 26, 2012

MOORE, Presiding Judge.

{¶1}     Appellant, Lalanya J. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, N.J., and placed him in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

{¶2}     Mother is the parent of N.J., born October 31, 2007.  N.J.'s biological father was never determined.  In early October 2010, Mother was incarcerated in the local county jail.  She had left her three-year-old son in the care of Keith Zeman, but became concerned about her child's safety based on a belief that Mr. Zeman was not an appropriate caregiver.  Therefore, she called LCCS, and Caseworker Jessica Rockas visited Mother in jail.  At Mother's request, the agency removed N.J. from the care of Mr. Zeman and arranged for the child to be placed at Blessing House for 20 days.  Thereafter, N.J. was placed with friends of Mother via a safety

plan. That placement ended within a month because the friends were no longer financially able to care for N.J. and questions arose about their suitability.

{¶3} In the interim, Mother was released from jail, but she was without resources to provide for her child's needs. In addition, because she had a positive drug test during her incarceration, she was awaiting entry into an inpatient substance abuse program. There were no suitable friends or relatives willing or able to provide care for N.J. The agency, therefore, filed a complaint in juvenile court and sought emergency temporary custody of N.J. on December 3, 2010. On February 25, 2011, the trial court adjudicated N.J. to be a neglected and dependent child and granted temporary custody of him to the agency. The adjudication was based on Mother's substance abuse, her actions in leaving N.J. in harmful and dangerous situations, her inability to provide for N.J.'s basic needs, and her inability to provide him with a safe and stable environment. Case planning tracked these concerns, requiring Mother to obtain substance abuse treatment, access mental health treatment, take parenting classes, and maintain a stable income and home.

{¶4} On October 11, 2011, the agency moved for permanent custody, claiming N.J. could not be placed with a parent within a reasonable time or should not be placed with a parent, and also that permanent custody was in the best interest of the child. Following a hearing, the trial court granted LCCS's motion for permanent custody. Mother appeals and assigns three errors for review.

II.

**ASSIGNMENT OF ERROR I**

The trial court erred, to the prejudice of appellant, the mother of the minor child, in granting permanent custody of the minor child to [LCCS] because appellant was not afforded effective assistance of counsel in the trial of this cause.

{¶5} Mother claims she was denied the effective assistance of counsel at the permanent custody hearing. To establish a claim of ineffective assistance of trial counsel, Mother must demonstrate that her counsel's performance fell below an objective standard of reasonable representation and that she was prejudiced by that performance. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. *See also Strickland v. Washington*, 466 U.S. 668 (1984). To establish prejudice, Mother must show that there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. *Strickland* at 694. In applying this test, the reviewing court should recognize that counsel is strongly presumed to have rendered adequate assistance. *Id.* at 690.

{¶6} On appeal, Mother cites three examples of claimed ineffectiveness, none of which satisfies the above test. First, Mother claims her trial counsel was ineffective for failing to object to the testimony of Robert P. Denton, supervising psychologist at Berea Children's Home and Family Services, who testified regarding the results of a psychological assessment performed on N.J. by one of his students. Mother contends that Dr. Denton's testimony should have been excluded as hearsay because he did not personally perform the assessment. For prejudice, Mother claims that Dr. Denton's testimony permitted the trial court to erroneously conclude that the diagnosis of N.J. with adjustment disorder with mixed disturbances of mood and conduct resulted from Mother's conduct.

{¶7} Mother has failed to cite to the portion of the record that supports her argument. Our review of the trial court judgment entry fails to disclose any reference to this diagnosis of N.J. Moreover, according to the testimony of Dr. Denton, there was no diagnosis of N.J. made in the psychological evaluation. Therefore, the trial court did not and could not have drawn any

causal connection from Mother's conduct to a diagnosis by Dr. Denton's student. We are compelled to conclude that Mother has not demonstrated prejudice in this argument.

{¶8} Additionally, we note that the cited diagnosis did find its way into the record, but it came through the testimony of the child's therapist, Rebecca Bangert, who testified to her treatment of N.J., and whose credentials were not contested. She explained that she and N.J.'s prior therapist, who had actually made the diagnosis, shared the goals of helping N.J. reduce his anxiety and adjust to life changes. Ms. Bangert did not attribute the diagnosis to Mother's conduct. In fact, she testified that N.J. had not identified any specific things that were causing him stress. Further, she explained that her efforts were directed more towards behaviors and coping mechanisms than to a determination of causes for the child's condition. The reference to the diagnosis in Ms. Bangert's testimony does not support Mother's argument.

{¶9} Second, Mother claims her trial counsel was ineffective for failing to object to the caseworker's testimony concerning inappropriate behavior by Mother during supervised visits with N.J. Mother has failed to detail the specific testimony to which she objects. Nevertheless, she argues that the caseworker's testimony was hearsay and should have been excluded because the caseworker did not personally observe the behavior, but rather only learned of it from a case aide. For prejudice, Mother claims that this testimony allowed the trial court to incorrectly conclude that Mother engaged in inappropriate conduct with her child during visitation and led to erroneous conclusions about Mother's parenting skills and her overall judgment.

{¶10} The trial court did find that Mother "has demonstrated some inappropriate behaviors at the visitation, demonstrating that she still is not making appropriate decisions for her son." The record reveals, however, that the LCCS case aide who supervised all of Mother's visits testified to essentially the same subject matter as did the caseworker, thus substantiating

the questionable behavior by her own observations. On appeal, Mother has not specifically objected to the allowance of any testimony by the caseworker that was not directly witnessed and addressed by the case aide. Further, Mother has not argued that the case aide's testimony was not properly before the trial court. Accordingly, any error in allowing the caseworker to testify to purported hearsay is rendered harmless, and no prejudice resulted from the failure of trial counsel to object to the caseworker's testimony.

{¶11} Finally, Mother contends that her trial counsel erred in failing to challenge the opinion of the guardian ad litem on the basis that she had only been appointed a few months prior to the permanent custody hearing. According to Mother, this permitted the trial court to conclude that the guardian ad litem favored the termination of parental rights despite having limited contact with Mother or N.J.

{¶12} Had counsel mounted a successful challenge on this basis, it would not have resulted in the exclusion of the opinion of the guardian ad litem, but would merely go to the weight given to the testimony. This is so because Mother has not challenged the validity of the appointment or the service of the guardian ad litem, but only the reliability of her opinion. The record demonstrates that Mother's trial counsel did establish, through her cross examination of the guardian ad litem, that the present guardian ad litem served from November 28, 2011 until her testimony at the hearing on March 2, 2012, and that she observed N.J. with Mother four or five times and observed N.J. with the foster father three times. Mother's trial counsel also established that N.J. appeared to be bonded to Mother and was happy to see her at visits. Trial counsel, thus, introduced facts that would permit the trier of fact to evaluate the weight to be accorded the opinion of the guardian ad litem. Mother has not demonstrated that her trial counsel's performance on this point fell below an objective standard of reasonable

representation. In addition, Mother's argument that her trial counsel should have obtained the testimony of the prior guardian ad litem is entirely speculative in that there is no basis on which to conclude that the prior guardian ad litem would have supported Mother's position.

{¶13} Notwithstanding Mother's argument about the brief tenure of the guardian ad litem, the final report of the present guardian ad litem does not appear to be inherently deficient. In the four and one-half page, single-spaced report, the guardian ad litem recounted that she reviewed medical records, court records, and the interim report of the prior guardian ad litem. She consulted with Mother's counselor and the child's therapist. She had several telephone conversations with the caseworker as well as several with the prior guardian ad litem. She analyzed the child's condition, current placement, and educational situation. She also addressed Mother's status, progress, and likely ability to be able to care for N.J. Although the present guardian ad litem had a relatively short tenure, her report reflected reasonable preparation and thoroughness. Its inclusion in the record does not support a finding of ineffective assistance of trial counsel.

{¶14} Mother's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

The trial court erred, to the prejudice of appellant, the mother of the minor child, in granting permanent custody of the minor child where the evidence was insufficient to sustain a motion for permanent custody.

### ASSIGNMENT OF ERROR III

The trial court abused its discretion when it granted permanent custody of the minor child to [LCCS] after receiving clear and convincing evidence that the natural mother's situation could ameliorate thereby allowing return of custody of the minor child to his natural mother.

{¶15} The second and third assignments of error are related and will be considered together. Through these assignments of error, Mother challenges the judgment granting

permanent custody of N.J. to LCCS as not being clearly and convincingly supported by the evidence.

{¶16} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). A determination that permanent custody is in the best interest of a child requires consideration of all relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb* 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶17} The trial court found that the first prong of the test was satisfied because N.J. could not be returned to a parent within a reasonable period of time and should not be returned to a parent. The trial court also found, under the second prong of the test, that permanent custody would be in the best interest of the child.

{¶18} We first address Mother's claim that the case should be reversed based on her substantial compliance with her case plan. This Court has repeatedly indicated that substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous. *See, e.g., In re Watkins v. Harris*, 9th Dist. No. 17068, 1995 WL 513118, at \*4 (Aug. 30, 1995). Moreover, while evidence of case plan compliance may be relevant to the trial court's best interest determination, it is not dispositive of it. *See, e.g., In re A.A.*, 9th Dist. No. 22196, 2004-Ohio-5955, ¶ 9; *In re Atkins*, 9th Dist. No. 19037, 1998 WL 801893, at \*6 (Nov. 18, 1998). Rather, the termination of parental rights is governed by R.C. 2151.414 and the proper focus of a best interest determination is on the specific factors listed in R.C. 2151.414(D). Furthermore, the record does not support Mother's claim that she substantially complied with her case plan. As demonstrated more fully below, Mother has maintained a clean and sober life style for only three or four months and she was in a protected environment for most of that time, she had not completed her parenting classes, she had not completed her mental health counseling, she had not yet begun working in her claimed job, and she had not yet lived in the home donated to her by her sister.

{¶19} We next address Mother's specific claim that her substance abuse issues were finally under control and that her son could be returned to her within a reasonable time. In support, Mother cites evidence that she completed the "five milestone objectives" at The Key, a residential treatment facility; that she has been clean and sober since November 2011 and has not tested positive for drugs since that time; that she attends 10 to 14 Alcoholics Anonymous ("AA") meetings per week; and that Rebecca Coleman of AA has observed a marked change in Mother's attitude toward sobriety in that she is now taking the issue seriously.

{¶20} However, LCCS also presented evidence that puts that claim into doubt. Prior to Mother's recent struggles with sobriety, she experienced years of substance abuse with repeated efforts at treatment and relapses. According to Caseworker Rockas and Dorothy Kay Jones, Mother's counselor at The Key, Mother had been in treatment for substance abuse in 2006, 2008, and 2010, and relapsed each time. Mother was diagnosed with heroin, cocaine, and alcohol dependencies in October 2006, but her case was closed because Mother did not follow through with treatment. Mother was unsuccessfully discharged from a treatment facility in December 2008, when she left against advice. And in July 2010, Mother was asked to leave The Haven when she tested positive for cocaine, opiates, and benzodiazepines after a two-hour absence from the facility.

{¶21} During the present case, LCCS referred Mother to The Key for residential treatment for cocaine, opiate, and alcohol dependency in November 2010. The staff tried very hard to keep her in treatment because of concern of what would happen to her if she were discharged, despite several rule violations that included carrying a prescription belonging to another and testing positive for opiates and cocaine. On December 21, 2010, Mother was finally discharged from the facility when she took suboxone from another resident.

{¶22} Mother again entered The Key in November 2011. Counselor Jones noted that Mother passed a drug test on November 14, 2011, and she testified that Mother ultimately completed her five treatment "milestones." Those milestones include engaging in treatment and having three successful days; presenting 20 harmful consequences based on her use and creating an autobiography; accomplishing the first three steps; making trigger cards and a prevention plan for those triggers; and using the prevention plan and staying clean for 30 days. Ms. Jones also stressed, however, that despite completing these milestones, Mother "needs" additional

treatment. She emphasized that it was important that Mother have her own income and her own housing, and not be dependent on anyone else, particularly men, since she has had a problem with dependency on men in the past. Ms. Jones indicated that while Mother was at The Key, in January 2012, she was aware that Mother had a continuing relationship with Keith Zeman, the man Mother previously acknowledged as presenting a risk to her son.

{¶23} Upon leaving The Key, Mother went to the Julie Adams Treatment Center in Medina. The program at that facility consists of two months of intensive treatment and up to six months of part-time programing and efforts directed towards finding housing and employment. Within a week after moving to the Julie Adams Treatment Center, and one day before the permanent custody hearing began, Mother moved to Jennifer's Gate in Lorain, a sober living house, with a plan to re-engage at The Key in intensive outpatient treatment.

{¶24} Rebecca Coleman, a witness called by Mother, testified that she is currently in recovery herself and has been a co-sponsor of Mother since September 2011. She stated that she believes Mother has made a major improvement in the last three weeks. At the same time, she admitted to a concern that Mother's sobriety would last, particularly since she had used men to obtain drugs in the past. She stated that she did not believe it best for N.J. to return to Mother now as Mother has "a little ways" to go before she could offer the child a proper, stable environment.

{¶25} Mother also asserts that she will be able to provide for the basic needs of her son and points to the procurement of a full-time job at McDonald's and the attainment of a home as meaningful progress towards stability. She also points to the strong bond between her and her son. In fact, however, Mother had not yet started the job and had not yet moved into the home, which was being offered to her rent-free for one year by her sister. The fact that Mother had

obtained employment was not contested, but neither did Mother offer any documentary evidence of that employment.

{¶26} Stability has been a serious deficiency for Mother in the recent past. Along with her son, she spent the last several years moving between the homes of friends and relatives as well as shelters and treatment facilities. Some of those friends exposed both her and her son to violence. Mother was the victim of domestic violence by three different men with whom she had had relationships in 2008, 2009, and 2010. And some of those friends facilitated her substance abuse problems. One of her male friends reportedly provided her with illegal drugs in the past and a female friend was with her when she relapsed in November 2011.

{¶27} The last year also unfortunately included a four-month journey through a lengthy hospitalization following a fall, a stay in a nursing facility, and further rehabilitation at her mother's home. Initially, Mother was permitted to leave the nursing facility for pain management treatment at the Cleveland Clinic and for AA meetings, provided she returned for her intravenous antibiotic treatments. She repeatedly failed to return at the appointed times, however. That disrupted her treatment and caused concern to the staff. It became a significant enough of a problem that her doctor specifically requested that Mother's leaves of absence be discontinued, and he further indicated that if the patient did not agree, that she would have to find another doctor.

{¶28} When Mother was ultimately released from the nursing facility, she resided sequentially with her own mother, an uncle, a friend, and then finally once again at The Key, where she finally succeeded in passing through their program. At the time of the hearing, Mother was residing in a small group home, which was a somewhat protected environment.

While she has made some positive strides recently, Mother has yet to demonstrate that she is fully capable of supporting herself and living independently.

{¶29} Mother was also asked to complete a mental health assessment and comply with the recommendations. Mother completed an assessment and was given a diagnosis of opioid dependence and adjustment disorder with anxiety. She had completed five of seven scheduled sessions with a therapist at the time of the permanent custody hearing.

{¶30} Because of concern about Mother's supervision of her son and her ability to provide for his basic needs, she was asked to complete a parenting course. Mother did not begin the parenting course until September 2011, and attended six or seven classes, but has not completed the program. Otherwise, Mother's parenting was observed during her participation in visitation. There was evidence before the trial court that visits between Mother and her son generally went well and she attended visits regularly. They demonstrated affection to each other and both of them appeared to enjoy the visits. Mother brought toys and appropriate food to the visits.

{¶31} However, there was also evidence before the trial court of some questionable behavior by Mother during visits. The case aide verbally addressed these behaviors with Mother during visits, and the caseworker more formally addressed them in a letter, dated November 3, 2011, advising Mother that such behaviors were inappropriate. Even after the verbal and written warnings, however, the caseworker found that the inappropriate behaviors continued to occur during visits. N.J. was referred to the Berea Children's Home, and following an interview, it was reported that he did not disclose any kind of sexual abuse. The trial court, however, found that Mother's behavior led him to question Mother's judgment.

{¶32} In her own testimony, Mother admitted that she had not been a good parent in the past, but she had sought rehabilitation and now knows how good it is to be sober. She said that she loves her child and that he loves her. She stated that she was grateful to Children Services for putting her into its program because it helped her to change. She believes her life is coming together now and that she can be a good mother to N.J.

{¶33} Evidence was also provided about N.J.'s foster father. The caseworker and guardian ad litem both indicated that the foster father was attentive and provided a stable home for N.J. The caseworker explained that the foster father and N.J. were very attached and that N.J. was very comfortable in the home. N.J. had some initial transitional problems with night terrors and nightmares, but those problems were said to have decreased.

{¶34} Regarding the remaining best interest factors, the guardian ad litem reported that then four-year-old N.J. said he would like to live with his foster father. N.J.'s custodial history is that he resided with Mother until this case was initiated in October 2010. The caseworker testified that N.J. was in need of a legally secure placement and that there were no suitable friends or relatives willing to provide for his care. Mother's suggestions for custodians included a friend with whom she had last relapsed into drug use and another friend who is the "house mother" at a "strip club" called The Brass Pole. The caseworker stated that Mother cannot provide safety or stability for her son. She felt that he has been placed at risk of harm numerous times while living with Mother. He needs a safe and secure placement and she believes that permanent custody is in his best interest. The guardian ad litem also recommended permanent custody as being in the best interest of the child.

{¶35} Finally, Mother complains that, in seeking to excuse the participation of Rodrick Franklin, the presumed, but genetically-excluded father of N.J., from attending the permanent

custody hearing, Mr. Franklin's attorney told the trial judge that Mr. Franklin was in favor of permanent custody for N.J. Counsel's brief statement was unsworn and without any supporting explanation. The trial court briefly referred to the statement in its judgment entry. The statement was merely made in passing and is without relevance.

{¶36} Upon consideration, the record demonstrates that there was clear and convincing evidence before the trial court from which it could conclude that N.J. could not or should not be placed with a parent within a reasonable time and that permanent custody was in the child's best interest. Mother's second and third assignments of error are overruled.

III.

{¶37} Mother's three assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, J.
BELFANCE, J.
CONCUR.

APPEARANCES:

DALE C. FENELI, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and AMY L. PRICE, Assistant Prosecuting Attorney, for Appellee.

KATHY BEVAQUE, Guardian ad litem.